566 F.2d 763
 185 U.S.App.D.C. 98
 SEA-LAND SERVICE, INC.
v.
Juanita M. KREPS, Individually and as Secretary of Commerce,
et al., American President Lines, Ltd., Appellant.
SEA-LAND SERVICE, INC.
v.
Juanita M. KREPS, Individually and as Secretary of Commerce, et al.
 Nos. 76-1204 and 76-1389.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued 17 March 1977.
Decided 30 Sept. 1977.
Rehearing Denied Nov. 1, 1977.
 
 Warner W. Gardner, Washington, D. C., with whom Franklin D. Kramer, Washington, D. C., was on the brief, for appellant in No. 76-1204.
 Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellants in No. 76-1389 and appellee, Kreps in No. 76-1204. Morton Hollander, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellants in No. 76-1389.
 Edward M. Shea, Washington, D. C., with whom Gary R. Edwards, Washington, D. C., was on the brief, for appellee, Sea-Land Service, Inc.
 Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.
 Opinion for the Court filed by WILKEY, Circuit Judge.
 Dissenting opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.
 WILKEY, Circuit Judge:
 
 
 1
 This appeal is from an order of the District Court (Robinson, J.) reversing the decision of the Maritime Subsidy Board (hereinafter the Board) to grant an amended operating differential subsidy (ODS) contract to intervenor-appellant American President Lines, Ltd.[1] (APL) pursuant to the Merchant Marine Act of 1936 (the Act).[2] Before the Board can grant an ODS to a United States flag carrier, it is required by section 605(c) of the Act to find that "the service already provided by vessels of United States registry is inadequate. . . ."[3]
 
 
 2
 The sole issue presented in this appeal is whether the Board can lawfully recognize transoceanic cargo carried by U. S. flag vessels between Canada and the Far East in making the finding as to the adequacy of U. S. flag service on a particular trade route.[4] The Board ruled that such cargo could be recognized for purposes of making the section 605(c) adequacy determinations;[5] the District Court reversed the Board on this point.[6] We conclude that the District Courts' interpretation of section 605(c) was in error and that the Board's position was a proper interpretation and application of the Act entitled to deference from the reviewing court. Accordingly, we reverse the order of the District Court and remand the case with instructions to affirm the Board's decision to grant the ODS application of APL.
 
 I. BACKGROUND
 
 3
 A. Statutory Framework.
 
 
 4
 The Merchant Marine Act of 1936 was enacted to foster the development and continued maintenance of a modern merchant marine fleet for the United States.[7] The Act's declaration of policy states that
 
 
 5
 It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency * * *.[8]
 
 
 6
 To accomplish these goals the Act establishes two subsidies for American shipping enterprises the operating-differential subsidy that is the focus of this appeal, and a construction-differential subsidy (CDS) that is not implicated in these proceedings.[9]
 
 
 7
 The operating-differential subsidy is governed by Title VI of the Act. Under section 601(a) of the Act, the Secretary of Commerce is authorized and directed "to consider the application of any citizen of the United States for financial aid in the operation of a vessel or vessels, which are to be used in an essential service in the foreign commerce of the United States * * *."[10] The approval of an application for ODS is predicated on a determination by the Secretary that "the operation of such vessel or vessels in an essential service is required to meet foreign-flag competition and to promote the foreign commerce of the United States"; that the applicant possesses the vessels and qualifications necessary to enable him "to meet competitive conditions and promote foreign commerce"; and that the subsidy is "necessary to place the proposed operations * * * on a parity with those of foreign competitors, and is reasonably calculated to carry out effectively the purposes and policy of this Act."[11]
 
 
 8
 The term "essential service " is expressly defined in section 601(a) to mean "the operation of a vessel on a service, route, or line described in section 211(a) * * *."[12] Section 211(a) of the Act authorizes and directs the Secretary to determine
 
 
 9
 (t)he ocean services, routes, and lines from ports in the United States, or in a Territory, district, or possession thereof, to foreign markets, which are, or may be, determined by the Secretary of Commerce to be essential for the promotion, development, expansion, and maintenance of the foreign commerce of the United States, and in reaching his determination the Secretary of Commerce shall consider and give due weight to the cost of maintaining each of such steamship lines, the probability that any such line cannot be maintained except at a heavy loss disproportionate to the benefit accruing to foreign trade, the number of sailings and types of vessels that should be employed in such lines, and any other facts and conditions that a prudent business man would consider when dealing with his own business, with the added consideration, however, of the intangible benefit the maintenance of any such line may afford to the foreign commerce of the United States, to the national defense, and to other national requirements(.)[13]
 
 
 10
 If the Secretary approves the application for an ODS, a contract is entered into with the applicant for payment of the subsidy.[14] The amount of the ODS is the excess of certain operating costs (wages, insurance, maintenance and repairs) incurred in the operation of the subsidized vessel over the estimated fair and reasonable cost of the same items of expense if the vessel were operated under the registry of a foreign country whose vessels are substantial competitors of the subsidized vessel[15]. The subsidy contract specifies the trade route (the "essential service") for which the subsidy is authorized, including the number of vessels to be operated thereon, and the minimum and maximum number of outbound and inbound sailings by such vessels per year. Contracts are typically for 20-year terms.
 
 
 11
 Section 605(c) of the Act the provision involved in this case provides in pertinent part:No contract (for ODS) shall be made * * * with respect to a vessel to be operated in an essential service served by citizens of the United States which would be in addition to the existing service, or services, unless the Secretary of Commerce shall determine after proper hearing of all parties that the service already provided by vessels of United States registry is inadequate, and that in the accomplishment of the purposes and policy of this Act additional vessels should be operated thereon * * *.[16]
 
 
 12
 The Secretary of Commerce has interpreted this provision to cover significant changes in existing ODS contracts involving additional service (not only new ODS contracts); and to cover, among other things, additional sailings by existing subsidized vessels as well as the operation of additional vessels by existing subsidized lines.[17]
 
 
 13
 The effect of section 605(c) is thus to bar any increase in the maximum number of sailings specified in an ODS contract for a subsidized line operating in a particular trade route, if any other objecting American shipping company (subsidized or unsubsidized) operates U. S.-flag vessels in that trade route, unless the Secretary determines at a hearing that the existing service provided by all U. S.-flag vessels is "inadequate." Under a general guideline established by the Board, carriage by U. S.-flag vessels of less than 50 percent of the available waterborne U. S. foreign commerce on a particular trade route will be considered "inadequate." Carriage of 50 percent or more of the available U. S. foreign commerce by U. S.-flag vessels will be considered adequate unless a higher percentage is feasible.[18]
 
 
 14
 In summary, the Act authorizes the payment of ODS in order to promote the development of an American merchant marine, both for national defense purposes and to carry a substantial portion of this country's foreign commerce. ODS is authorized for U. S.-flag vessels in order to meet foreign flag competition and to carry U. S. foreign commerce in particular essential trade routes between American and foreign ports. Where competing U. S.-flag carriers operate, no ODS contracts may be executed, and no additional sailings by subsidized vessels can be authorized, unless existing services provided by all U. S.-flag vessels in a particular trade route are determined to be inadequate.
 
 
 15
 B. The Application by APL.
 
 
 16
 APL, a subsidized line, filed an application with the Board on 3 June 1971 requesting authority for additional sailings between ports in the Pacific Northwest of the U. S. and the Far East, within Trade Route No. 29.[19] Trade Route No. 29 shipping service has been determined by the Secretary of Commerce to be an "essential service" under section 211(a) of the Merchant Marine Act.[20] This Route is the ocean trade route between U. S. Pacific ports (in Alaska, Washington, Oregon, California, Hawaii, and U. S. islands lying between the United States and the Far East) and ports in Japan, Taiwan, Philippines, the Continent of Asia from the U.S.S.R. to Thailand, inclusive, and other Pacific Islands lying between the United States and the Continent of Asia.[21]
 
 
 17
 The principal American ports served by Trade Route No. 29 are Seattle and Tacoma (Washington), Portland (Oregon), and San Francisco and Los Angeles (California). There are two adjacent Canadian ports in the Puget Sound area, Victoria and Vancouver, in British Columbia. As a matter of practice, most U. S.-flag and foreign-flag trans-Pacific vessels which serve the American ports in Puget Sound, including the parties to this case,[22] also serve one or both of these Canadian ports.
 
 
 18
 The APL application sought the approval of the Board for an increase in the maximum number of sailings by its vessels operating on Route 29 from 60 to 80 sailings per year. In consequence of converting four breakbulk freighters into containerships,[23] APL proposed to revise its trans-Pacific service by instituting a weekly shuttle service between the Pacific Northwest and Japan (i. e., 52 round-trip sailings). In addition, APL proposed using 6 additional breakbulk vessels (5 having some container capacity), to institute 28 annual sailings (13-day frequency) from the Pacific Northwest to the Korea-Singapore range (involving Trade Route Nos. 29 and 17).[24] APL expected that the latter vessels would be converted to partial or full containerships by 1975. Since these containerships are capable of being loaded and unloaded faster than breakbulk vessels, and are faster, APL could expect to increase its sailings from 60 to 80 per year without any increase in the number of its vessels.
 
 
 19
 Since no increase in the number of vessels was requested in this application, no increase in the amount of ODS was involved.[25] The increase in the number of sailings was, however, deemed by the Board sufficient to require notice and opportunity for hearing under section 605(c) of the Act.
 
 
 20
 C. Factual Basis Underlying the Dispute.
 
 
 21
 The dispute in this case centers around the particular technique (the formula) used by the Board in making the section 605(c) adequacy determination. At this stage in the litigation there is no dispute as to the underlying data to be used in the formula that is chosen; the dispute is solely over the proper formula to apply to these undisputed facts. Since the data as to projected capacity and cargo are central to all phases of this case, we provide that data at this point and reserve our discussion of the proper calculation technique for Part II of this opinion.
 
 
 22
 In discussing the data involved in this case, there are two sets of figures that are relevant to a determination of adequacy. The first is the available capacity of the ships serving the particular geographical area in question; the second is the available cargo to be carried to or from that geographical area. There is no dispute that it is the ratio of capacity to cargo that yields the relevant percentage in determining the adequacy of U. S.-flag service. Rather the controversy revolves around the correct method of determining the available capacity of U. S.-flag vessels.
 
 
 23
 The Board projected that, for calendar year 1975, 755,000 long tons of containership cargo[26] would be available for shipment from the Far East inbound to American ports in the Pacific Northwest portion of the Trade Route No. 29.[27] The Board's figures also showed that a total of 336,000 long tons of containership cargo would be available for shipment from the Far East inbound to the Canadian ports off Puget Sound.[28] The combined projected available inbound containership cargo for this particular sea route was thus 1,091,000 long tons for 1975.
 
 
 24
 The Board's figures revealed that the projected net cargo-carrying capacity of the inbound containerships of all U. S.-flag operators serving the Pacific Northwest portion of Trade Route 29 would be 432,000 long tons for 1975.[29] It is important to note that this figure was based on the assumption that no applications for increased sailings, such as made by APL, would be granted. In addition to this U. S.-flag capacity, the Board projected that the capacity of the containerships of all foreign-flag operators serving the inbound Pacific Northwest portion of Trade Route 29 would be 595,000 long tons for 1975.[30] Thus, according to the Board, the total inbound net cargo capacity for all U. S. and foreign-flag containerships on the relevant portion of Trade Route 29, was projected to be 1,027,000 long tons for 1975. Quite significantly, this projected capacity was less than the projected available inbound cargo of 1,091,000 long tons for 1975.[31] Now that these figures relating to available capacity and cargo have been presented, we can proceed to describe how the raw data was treated in the proceedings at the agency level and in the district court.
 
 
 25
 D. The Agency Proceedings.
 
 
 26
 1. The Initial Agency Decision. The application by APL was consolidated with the applications of other subsidized lines for additional service on Trade Route No. 29. The U. S.-flag carriers operating at the time on the Pacific Northwest portion of Trade Route 29 were APL (subsidized), States Steamship Company (subsidized), and Sea-Land Service, Inc. (unsubsidized). Sea-Land Service, Inc., the appellee in this case, intervened in the proceedings to oppose the applications under section 605(c) of the Act. Sea-Land contended that the service already provided by vessels of United States registry on the Pacific Northwest portion of Trade Route 29 was "adequate", and therefore no increase in sailings by a subsidized line was authorized on that route under the terms of section 605(c).
 
 
 27
 Following a hearing the administrative law judge (ALJ) issued a decision on 7 March 1973.[32] In this decision the ALJ denied APL's application for the requested increase in sailings. With respect to the Canadian cargo issue, the ALJ held:
 
 
 28
 As a final matter, Sclar (the expert witness for APL) included Canadian-Far Eastern containerizable cargoes in his 1975 projection. It is accepted that such cargo may actually move in U. S.-flag vessels on T.R. 29 and to that extent, reduce the vessel capacity otherwise available for T.R. 29 cargoes. What is not accepted is the U. S.-flag subsidized operators' claim that a part of their capacity for which subsidy payments are intended to give U. S. cargoes a priority will be assigned to Canadian traffic and that additional subsidized capacity will be required for U. S. cargoes. This is the effect of adding Canadian cargoes to the pool for determining adequacy of service. Such procedure is rejected. The portion of the relevant market analyzed in Sclar's projections here found acceptable, therefore, is limited to the T.R. 29 liner containerized cargo volumes, and the forecasts in Table 5, infra, reflect this limitation.
 
 
 29
 There can be no disagreement that U. S.-flag vessels operating under subsidy contracts must give priority to the commerce of the United States over that of foreign nations including Canada. Therefore, in deciding whether the service on T.R. 29 is adequate, the entire capacity of such vessels will be considered available for competitive commercial cargo on the route except as the United States may have allowed a pre-emption for other traffic. * * *[33]
 
 
 30
 The formula approved and used by the ALJ in making the section 605(c) adequacy determination can be represented as follows:
 
 
 31
 When this formula is applied to the facts enumerated in Part I.C., supra, the result is that the U. S.-flag vessels have the capacity to carry some 57% Of the available projected cargo inbound to U. S. ports, a figure that is well above the 50% Guideline generally used by the Board.[34] This formula does not provide for a reduction in the capacity of the U. S. vessels to take account of the Canadian cargo that is carried by these vessels.
 
 
 32
 2. The Decision of the Board. The decision of the ALJ was appealed to the Board on a variety of grounds, including the Canadian cargo issue. The Board issued its decision in consolidated proceedings on 3 January 1974.[35] On the Canadian cargo question the Board reversed the ALJ, holding that:
 
 
 33
 In a determination of ship container capacity to containerized cargo, Canadian cargo, which the parties did carry in 1970 and which there is no evidence to indicate they will not carry in 1975, must be recognized. The Judge accepted AML's and other ship operators' container capacity without making any reduction for this cargo * * *, but he excluded it from the 1975 pool of containerized cargo. A more reasonable approach is to provide for a reduction in ship container capacity (along with a) reduction in the pool of containerized cargo.[36]
 
 
 34
 The formula used by the Board to determine adequacy is as follows:
 
 
 35
 The application of this formula yields the conclusion that U. S.-flag vessels would carry only 37% Of the cargo available for inbound shipment to the United States. The difference in result achieved under this formula results from subtracting one-half of the Canadian cargo space from each of the U. S and foreign-flag capacities.[37] The Board also found that, if it were to grant the request by APL for additional sailings, the additional vessel service would result in an inbound net capacity of 514,000 long tons (as opposed to 432,000 long tons without the additional service) for all U. S.-flag containerships.[38] Along with the projected 595,000 long tons of foreign vessel net capacity, a combined inbound net capacity of 1,109,000 long tons would result with the addition of APL's requested service. This total would then be enough to accommodate the total 1,091,000 long tons projected available inbound cargo.
 
 
 36
 If the increased net capacity figure of 514,000 long tons is used in the Board's formula, the percentage of cargo to be carried by U. S.-flag vessels rises to 48% From 37%.[39] Given these figures (48% With approval of the application and 37% Without) the Board held that the existing U. S.-flag service would be "inadequate," and that the additional service requested by APL would be warranted. The Board ruled:
 
 
 37
 Whether or not these projected U. S.-flag participation percentages establish adequate or inadequate U. S.-flag service turns on the following test of adequacy:
 
 
 38
 (W)e should consider a 50 percent objective as a goal in determining whether we have a merchant marine sufficient to carry 'a substantial portion of the waterborne export and import foreign commerce of the United States,' and in applying this guideline to any given factual situation no particular arithmetical percentage will be deemed per se adequate or inadequate; rather, it will be recognized that a U. S. merchant marine service of the highest percentage practically attainable is our goal. (footnote omitted).
 
 
 39
 Hence, generally 50 percent U. S.-flag participation has been used as a guideline, but it may exceed that percentage if a higher percentage is practically attainable.
 
 
 40
 The 1975 projected inbound PNW trade of 48 percent U. S.-flag participation with approval of the containership sailing applications is less than the 50 percent objective. It is significantly better than the 37 percent U. S.-flag participation anticipated without approval of these applications. The increased capacity will consist of modern, competitive vessels efficiently deployed and historically operated at relatively high utilization percentages. We therefore find that the 1975 projected U. S.-flag participation of 37 percent in T.R. 29 containerized liner commercial traffic inbound to PNW is inadequate U. S.-flag service and additional service to provide 48 percent participation is warranted.[40]
 
 The Board further held:
 
 41
 In summary, grant of AML's application will serve the important policy objectives of the Act of development of efficient and effective U. S.-flag operations without serious adverse impact on other U. S.-flag operations and of reduction of U. S.-flag operators' dependence on operating subsidy with no attendant increase in subsidy. Further, there is a reasonable expectation that approval of AML's application will lead to increased U. S.-flag participation on T.R.s 17 and 29. Accordingly, we find that grant of AML's application will be in the accomplishment of the purposes and policy of the Act within the meaning of Section 605(c).[41]
 
 
 42
 On 18 January 1974 appellee Sea-Land filed with the Secretary of Commerce a petition to review the Board's decision. This petition was denied by the Secretary on 28 March 1974. The Board granted APL's application on 26 April 1974. On 31 July 1974, APL's contract for ODS was amended, pursuant to the Board's decision, by increasing the maximum number of sailings from 60 to 80.E. The Decision of the District Court.
 
 
 43
 On 23 May 1974 appellee Sea-Land Service filed this action in the District Court seeking to set aside the Board's decision granting APL's application for 20 additional sailings on the Pacific Northwest portion of Trade Route No. 29. Sea-Land contended inter alia that the Board had erred in reducing the actual vessel capacity figures to reflect cargo expected to be discharged or picked up at the adjacent Canadian ports in the Pacific Northwest, "thereby effectively providing for United States government subsidy to the foreign commerce of Canada".[42] APL intervened as a party defendant to support the Board's decision on the Canadian cargo question.[43]
 
 
 44
 On cross-motions for summary judgment the district court ruled in favor of Sea-Land on the Canadian cargo issue. The court held:
 
 
 45
 The Court is persuaded that the Administrative Law Judge was correct and the Board in error (on the Canadian cargo issue). In determining "adequacy" in a Section 605(c) proceeding, the Board is to include cargo moving in United States foreign commerce only. Although it is entirely permissible and indeed proper to consider the existence of trade "external" to the United Stages foreign commerce, the Board has done much more here. By improperly including the Canadian cargo in its calculations, the Board has created an unrealistic and improper picture of the adequacy of the service provided by United States vessels.[44]
 
 
 46
 The District Court accordingly ordered the case to be remanded to the Board for reconsideration of the "adequacy" determination in accordance with its memorandum. The apparent intent of the court's order was to require the Board to deny APL's application for 20 additional sailings, since, as the administrative law judge held, existing U. S.-flag vessel service would be "adequate" under a quantitative assessment if its entire net capacity should be allocated to the available cargo on the Pacific Northwest portion of Trade Route No. 29 which is expected to be discharged or loaded solely at the American ports in the Pacific Northwest.
 
 
 47
 The District Court thus sanctioned the formula used by the ALJ in the initial agency decision: that is, to ignore the Canadian cargo in determining the capacity of U. S.-flag vessels operating on the Northwest Portion of Trade Route 29. This decision to ignore the Canadian cargo has the effect of increasing the attributable capacity of U. S. vessels and thus to increase the percentage of the available cargo which they can putatively carry.
 
 
 48
 With this background in mind, we now proceed to an analysis of the legal issues presented in this case.
 
 II. ANALYSIS
 
 49
 A. Scope of Review.
 
 
 50
 We are called upon in this appeal to review the actions of the District Judge in reversing the decision of the Maritime Subsidy Board; this is not a direct appeal from the final decision of an administrative agency.[45] Although the grounds on which the District Judge reversed the Board were not clearly stated, it appears to us that the decision was one of statutory construction; that is, the reversal was based on the District Judge's conclusion that section 605(c) of the Act prohibited the recognition of Canadian cargo in making the required adequacy determination.
 
 
 51
 In reviewing a decision of the District Court based on statutory construction i. e., a question of law we are not limited by the doctrines of " clearly erroneous" or "abuse of discretion" that are applicable to the review of factual determinations. Rather, the role of the appellate court is to determine the proper legal premise and to correct the error, if any, of the District Judge. In the circumstances of this case, we have "a view as to the applicable legal principle that is different from that premised by the trial judge; "[46] our reversal stems from this disagreement over the applicable rule of law and from a determination that the District Judge was unreasonable, arbitrary, or chargeable with an abuse of discretion.[47]
 
 
 52
 B. The Language of the Statute.
 
 
 53
 As a preface to the analysis of the issue presented in this appeal, it is necessary to emphasize the point that there is no question as to the lawfulness or the propriety of APL's carriage of Canadian cargo. With only minor exceptions, every line which served the U. S. Pacific Northwest in foreign commerce in 1975 under any flag also served Canadian ports in British Columbia.[48] It is conceded by all parties to this case that this customary carriage of Canadian cargo by a subsidized U. S.-flag vessel is lawful and proper.[49]
 
 
 54
 The relevant statutory language provides no direct guidance in resolving the dispute over the recognition of Canadian cargo under section 605(c). There is, however, a negative inference to be drawn from an examination of this language that accentuates the deference to be given the Board's interpretation, and, indeed, emphasizes the rationality of that interpretation, as our independent analysis shows. The express language of section 605(c) does not deal with the power of the Board to recognize or to ignore cargo discharged or loaded at nearby contiguous foreign nation ports for the purpose of determining the adequacy of U. S.-flag service on a particular trade route. The Act simply does not define the term "inadequate"; in the absence of a direct statutory mandate the agency charged with administering the statute (the Board) must of necessity look to the purposes underlying the particular statutory provision and the Act in general in order to delineate the contours of this critical term.[50] In determining the proper construction to be applied to section 605(c), we shall engage in this same type of analysis; that is, we shall first examine the Board's decision to recognize Canadian cargo in light of the purposes of section 605(c) and then compare this decision with the basic purposes of the Act itself.
 
 
 55
 C. Purpose of Section 605(c).
 
 
 56
 It is generally agreed that section 605(c) "is primarily designed to avoid subsidizing a trade when the trade is already adequately served by U. S.-flag carriers, i. e., overtonnaging."[51] This concern about overtonnaging is designed "to ensure that no undue competitive impact to United States-flag operators result(s) from (a) subsidy award."[52] The first point to be made concerning the purpose of section 605(c) relates to the nature of the inquiry needed to accomplish the objective set forth in the provision. In order to determine if a competitor has suffered actual economic injury as the result of an ODS award, an intensely practical inquiry is necessary. This inquiry must focus on the cargo and capacity that are in fact available on a particular trade route;[53] if a sizeable part of the cargo actually available and actually carried is ignored, a realistic assessment of competitive economic injury is not possible. The Board's decision to recognize Canadian cargo is consistent with the need for a practical and realistic approach to the determination of the adequacy of existing U. S.-flag service.
 
 
 57
 The economic purpose of section 605(c) is not subverted by recognizing Canadian cargo in this case. The Canadian-port cargo is readily available for carriage by most lines serving the American ports in the Pacific Northwest portion of Trade Route 29, and is in fact carried by most such lines. Indeed, as noted previously,[54] if the Board did not approve the additional sailings sought by APL, the total available cargo (American and Canadian ports) for 1975 would not be carried, or would be disproportionately carried by foreign-flag lines serving the area. Since the total capacity would not, under the Board's projections, equal the total available cargo in 1975 without the approval of APL's request, the existing vessel service was certainly "inadequate" in a practical sense. While this evidence as to inadequacy provides direct support for the Board's decision to encourage further American shipping activity in Trade Route 29, it does not speak directly to the issue of a proper competitive balance between subsidized and unsubsidized American shipping lines. It is to this point that we now turn.
 
 
 58
 If a subsidized line such as APL cannot offer additional sailings if the justification for the increase relies in part on available cargo to or from contiguous foreign nation ports, the subsidized lines would be put at a competitive disadvantage. In such a situation, the foreign and unsubsidized lines could compete for all of the available cargo in a contiguous U. S./ foreign port area; the subsidized lines, however, would tend to be limited to their present level of services because total U. S. flag service would nearly always be over-capacitated if only the American-port cargo is recognized.[55] Subsidized lines could rarely if ever justify an increase in services to carry available cargo to and from a common U. S./Canadian port area; approval of any increase would generally be prevented if it is assumed (contrary to fact) that all U. S.-flag vessel capacity is devoted only to carriage of American-port cargo.[56] This would appear to be unfair competition per se, a result directly contrary to the fair competition goal underlying section 605(c). While section 605(c) was designed to avoid unfair competition in favor of subsidized lines, it certainly was not designed to permit the opposite result.
 
 
 59
 The Board's ruling in this case does not abandon the goal of preventing overtonnaging on trade routes; rather, the decision pursues this goal with a fierce concern for the realities of the situation existing on Trade Route 29. This concern for the real world is to be commended; far too often government regulatory agencies depart from this worldly context in pursuing the policies embodied in the statutes which they administer. The concern for realistic information exhibited by the Board in this case allows the agency to accommodate the interests of both the regulated and unregulated parties in a manner consistent with the purposes of the legislation. That is, the use of the actual facts allowed the Board to reach a decision that avoids actual overtonnaging in the carriage of American cargo by American vessels, while moving toward the goal of adequate available U. S. tonnage. Given the compelling reasonableness of the Board's approach in recognizing the Canadian cargo, and the competitive consequences that would be visited on APL and other subsidized lines by the District Court's decision, we believe that the Board's interpretation of section 605(c) is the interpretation that is consistent with the statutory provision. The consistency of the Board's interpretation with the broader purposes of the Act will now be considered.
 
 
 60
 D. Purposes of the Act.
 
 
 61
 The two basic purposes of the Act are set forth in Section 101 of the legislation; the promotion of U. S. foreign commerce, and the concern for national defense.
 
 
 62
 1. Promoting U. S. Foreign Commerce. Section 101(a) of the Act declares that it is necessary to have a merchant marine "sufficient to carry . . . a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such . . . commerce at all times."[57] Appellee Sea-Land's main argument to this court is that the Board's decision is not directed at promoting U. S. commerce to the maximum extent feasible but rather represents a "subsidizing at the expense of the U. S. taxpayer, not only (of) our own foreign commerce, but that of Canada also."[58] We disagree strongly with the appellee on this point; we believe that the Board's decision to recognize Canadian cargo does in fact promote the goal of having a merchant marine sufficient to carry a substantial portion of the U. S. foreign commerce.
 
 
 63
 Under section 605(c), subsidy awards are made "with respect to a vessel to be operated in an essential service." It is true that "essential service" is defined as a service which promotes the "foreign commerce of the United States,"[59] and that foreign-to-foreign commerce is not included in this definition. But there is nothing in the Act to indicate that a subsidized vessel must serve U. S. commerce exclusively. Indeed, as we noted previously, there has been no suggestion that it is unlawful or improper for APL, or any other line (subsidized or unsubsidized) to carry Canadian cargo.[60] It is only in circumstances where carriage of foreign-to-foreign cargo by subsidized lines would conflict with the carriage by such lines of a "substantial portion" of the U. S. foreign commerce that the legislative policy as expressed in section 101 would be subverted. Such is not the situation presented in this case.[61]
 
 
 64
 In cases such as the present one where the foreign-to-foreign cargo is for practical purposes within the same trade route as the U. S.-to-foreign cargo, the recognition of the foreign-to-foreign cargo in fact enhances the goal of increasing the U. S.-flag carriage of U. S. foreign commerce. The liner operator serving the Pacific Northwest can with the support of the Canadian traffic offer more frequent service or larger vessel capacity to the U. S. ports in the Pacific Northwest than he could if his carriage were confined to that trade alone. And, for every unit of increase in U. S.-flag carrying capacity, a proportionately greater share of that unit can be assumed to be devoted to the U. S. foreign trade. Thus, for example, of the 20 additional sailings proposed by APL in this case, it may be assumed that the additional carrying capacity would be devoted to increased carriage of American-port cargo in at least the same proportion that the total American-port cargo (755,000 tons inbound) bears to the total Canadian-port cargo (336,000 tons inbound). This results in substantially increased carriage of U. S. foreign commerce. On the other hand, to ignore the Canadian-port cargo, and to deny any increased service by a subsidized line having additional cargo carrying capability, would either result in inadequate over-all shipping service for all of the available cargo, both Canadian and U. S., or would permit foreign-flag carriers eventually to fill their holds with the available excess Canadian and U. S. cargoes.[62] Both such possibilities or results are contrary to the legislative goal of increasing the U. S.-flag carriage of U. S. foreign commerce.
 
 
 65
 Thus, it is clear that recognition of contiguous foreign nation cargo, for purposes of increased services by subsidized lines, is not in conflict with the Act's policy of promoting U. S.-flag carriage of a "substantial portion" of U. S. foreign commerce. On the contrary, by increasing the U. S.-flag capacity to carry both the Canadian and American cargo, the legislative goal of increasing the U. S.-flag carriage of U. S. foreign commerce is directly promoted.
 
 
 66
 2. Concern for National Defense. In addition to the promotion of U. S. foreign commerce, section 101 of the Act declares the need for a merchant marine "capable of serving as a naval and military auxiliary in time of war or national emergency . . . ."[63] This concern for national defense was a primary purpose of the Merchant Marine Act;[64] indeed, as the Senate Report on the bill stated,[65]
 
 
 67
 Our Navy, without adequate auxiliaries, is as ineffective as an army at the front without munitions and food transportation to support it. From the standpoint of national defense, our safety demands imperatively an immediate and effective solution of the problem of building up our merchant marine.
 
 
 68
 The national defense objective of having a modern fleet in being and in readiness is not in any way impaired by the fact that the U. S. ships also call at Canadian ports; for purposes of serving as a naval auxiliary, "a ship is a ship regardless of whether it is used in intercoastal or foreign trade or partly in one and partly in the other."[66] As noted in Part II, supra, the decision of the Board in this case can be seen to promote the active carriage of U. S. foreign commerce and therefore to enhance the vitality of the U. S. merchant marine; this result is quite consistent with the goal of maintaining an active and modern merchant marine capable of being used for national defense purposes.
 
 
 69
 Having examined the two purposes of the Act and concluded that the Board's decision is strongly supportive of both, we now undertake to examine in more detail the main argument advanced by appellee Sea-Land. This argument is that the Board's decision results in a subsidy of Canadian foreign commerce.[67] Appellee extends its argument as follows:[68]
 
 
 70
 Like Canada, Mexico is also adjacent to the United States, and the Soviet Union lies but a few miles removed from the Alaskan coast. Following the logic of (the Board's decision), both Mexico and Russia would be entitled to similar subsidies from the U. S. taxpayers.
 
 
 71
 We have already refuted appellee's contention that the Board's decision does not promote U. S. foreign commerce, but it remains for us to examine this issue of who is the actual and intended beneficiary of the subsidy awarded pursuant to the Act. Appellee's contention with respect to the subsidy of Canadian commerce appears to derive from a misconception regarding the purpose and operation of the ODS subsidy. The subsidy is awarded to the owners of U. S.-flag vessels operating in an essential service; the subsidy is not awarded to the shipper, nor is the subsidy intended to benefit the shipper. Indeed, the individual shipper (Canadian, American, or otherwise) will pay the same rates to a subsidized, unsubsidized, or foreign line; the subsidized line will not provide this shipper with a lower rate as the result of the contributions received from the U. S. taxpayers in the form of an ODS subsidy. Rather, the benefit of the subsidy is to be found in the promotion of a modern American merchant marine capable of promoting U. S. foreign commerce and the nation's defense. In other words, the subsidy is for the benefit of the national maritime interest as defined by Congress, not for the individual shipper. When the Board grants a subsidy, its award is justified and the money can be deemed to have been well spent if the purposes of the Act are met. In the circumstances of this case, the purposes of the Act are indeed met by the Board's decision.[69]CONCLUSION
 
 
 72
 For the reasons we have put forth in this opinion, we believe that the District Court was in error in ruling that section 605(c) of the Merchant Marine Act of 1936 prohibits the recognition of Canadian cargo in determining the adequacy of existing U. S.-flag vessel service on a particular trade route. Although there is little guidance to be derived from the language of the statute itself, the Board's realistic interpretation of the Act allowing the recognition of the Canadian cargo serves to further the purposes of the legislation in a reasonable and sound manner, while the decision of the District Court does not. Since the only disagreement between the District Court and the Board concerned this issue of the proper treatment of Canadian cargo, the order of the District Court is reversed and the case is remanded with instructions to affirm the Board's decision to grant the ODS application of APL.
 
 
 73
 So ordered.
 
 
 74
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:
 
 
 75
 Because in my view, the court, like the Maritime Subsidy Board before it, misinterprets the purposes and mandate of a key section of the Merchant Marine Act of 1936,[1] I must respectfully dissent.
 
 
 76
 * Additionally to construction-differential subsidies,[2] the Act offers operating-differential subsidies the concern of this appeal for qualifying shipowners and operators.[3] The Board[4] is authorized to grant an operating-differential subsidy when "required to meet foreign-flag competition and to promote the foreign commerce of the United States . . . ."[5] Congress provides these subsidies because operating costs primary wages for foreign-flag ships are lower and because many foreign nations subsidize their own commercial vessels, thus rendering a wholly unsubsidized United States merchant marine economically untenable.[6] To protect other United States-flag carriers and the federal fisc,[7] however, Section 605(c) of the Act[8] requires that when another United States line is already serving the trade route for which an operating-differential subsidy is sought, the Board must conduct a hearing encompassing designated issues and make findings thereon.[9]
 
 
 77
 American President Lines, Ltd. (APL)[10] seeks Board approval of additional service[11] on one of its subroutes.[12] The extension of service involves a larger number of sailings of vessels already subsidized, and the Board analyzed APL's application under Clause 1 of Section 605(c),[13] which states that
 
 
 78
 (n)o contract shall be made under this title with respect to a vessel to be operated in an essential service served by citizens of the United States which would be in addition to the existing service, or services, unless the Secretary of Commerce shall determine after proper hearing of all parties that the service already provided by vessels of the United States registry is inadequate, and that in the accomplishment of the purposes and policies of this Act additional vessels should be operated thereon . . . .[14]
 
 
 79
 Both APL and Sea-Land Service, Inc., the party challenging the subsidy contract, agree that the trade route in question is an "essential service," and that there is "existing service" on it. The disputed question of fact before the Board was whether that existing service is inadequate and the question of law the one we must now answer[15] is how adequacy is to be determined.
 
 
 80
 Fortunately, we are not left without guidance. As the Board itself has often indicated, adequacy of existing service on a particular trade route generally is to be ascertained in light of the objectives of the Act.[16] And surely a court is duty bound to that course even though the language of Section 605(c) can be read to indicate that the two are separate considerations.[17] Relatively little is more firmly embedded in our law than the canon that legislative purpose is the touchstone of statutory meaning.[18] "Adequate" cannot sensibly be taken to connote anything but whatever is "adequate to achieve the purposes and policies of the Act."[19]II
 
 
 81
 The major objectives of the Merchant Marine Act of 1936 are readily ascertainable. As APL itself has aptly observed,
 
 
 82
 the predominant concern of the enacting Congress was the fear that foreign-flag service of the American trades would be terminated abruptly when war or other foreign emergency forced the withdrawal of the vessels. An American-flag merchant fleet was viewed as indispensable because it would remain in the service of our commerce when the foreign vessels were withdrawn.[20]
 
 
 83
 The other great purpose of the Act is to provide the ships necessary to the national defense.[21]
 
 
 84
 That these are the grand designs of the Act is set forward with relative clarity in Section 101:
 
 
 85
 It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign waterborne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency . . . .[22]
 
 
 86
 These concerns for uninterrupted export of our own products and import of foreign goods essential to our economy, and for a merchant fleet available and sufficient to supplement our military effort during an era of crisis were articulated often during congressional consideration of what became the Merchant Marine Act of 1936.[23]
 
 
 87
 The Board, expressly relying upon the legislative aims set down in Section 101,[24] has established fifty percent as a basic guideline for determining adequacy.[25] This figure, however, can have no meaning unless one knows what must be fifty percent of what. Nonetheless, the Board has never bothered to explain what relationship the figure describes. This is but a reflection of the problem central to this case: How, under the provisions of the Act properly construed, adequacy is to be ascertained; in other words, adequacy involves the relationship of what to what? Both the Board and the court say that the relationship is between the amount of cargo in our commerce and the capacity of United States-flag ships routinely devoted to that cargo, and that since the total United States-flag capacity ordinarily filled with United States-bound cargo is less than fifty percent of all United States-bound cargo on the trade route in question, the existing service is inadequate. Without impungning in any way the Board's prescription of fifty percent as the mathematical point of demarcation between adequacy and inadequacy, I submit that the wrong factors have been compared.
 
 
 88
 Both of the predominant purposes of the Act relate directly to the facts of shipping capacity and volume of waterborne cargo during an emergency war or a foreign country's cutoff of its shipping services for any reason whatever. Thus, at least with reference to these two critical objectives, adequacy is to be measured not by whether a substantial amount of United States cargo is ordinarily carried by United States-flag vessels, but rather by whether it could be so carried if foreign-flag service to the United States were to be appreciably interrupted. The Act itself is filled with references to that hypothetical context: "sufficient to carry,"[26] "capable of serving,"[27] just to mention two. It will also be recalled that the statute is so worded as to protect "essential" routes, not all those habitually traveled.[28] This is a further indication of the overriding congressional concern with assuring against a loss of shipping vital to the domestic economy and the national defense.
 
 
 89
 Most determinations under the fifty percent standard are relatively straightforward because routine carriage of foreign wayport cargo in United States bottoms seldom occurs. In the normal instance, if United States-flag vessels are now carrying, and by projection will continue to carry, fifty percent of our waterborne foreign commerce, it can safely be assumed that they will be able and available to do so in an emergency.
 
 
 90
 The situation under scrutiny in this case, however, is complicated by the location of the subroute involved. Because the British Columbia ports of Vancouver and Victoria are so close to our Pacific Northwest ports, United States-flag vessels serving our ports commonly carry Canadian cargo.[29] Thus, present-day figures on United States-flag carriage of United States-bound cargo, as well as projections of what a future uneventful year will look like, are not descriptive of the merchant marine's capability in a crisis. Regardless of whether in routine 1975 business United States-flag vessels transported substantial Japan-to-Canada cargo, in an emergency all of the tonnage of those ships would be available to maintain the commerce of the United States and to provide support services for the military. As the court admits, "a ship is a ship" regardless of its current usage.[30]
 
 
 91
 The routine carriage of Canadian cargo thus appears irrelevant to the goal of subsidization, which, as noted earlier, is to assure that in the absence of foreign-flag service United States-flag carriage could meet our country's basic economic and defense needs.[31] In line with that objective, the pertinent comparison is between those needs here, the projected traffic inbound to United States ports[32] and our merchant fleet's ability to serve those needs.[33] I fail to discern why that capability should be established on the assumption that, even in the event that foreign-flag service to the United States is rendered unavailable to the Nation's shippers, our merchant marine will continue, and will be allowed to continue, on a business-as-usual basis to devote a substantial percentage of its resources to serving the economy of Canada.[34] Some cogent rationale might lurk behind the Board's ipse dixit that inclusion of Canadian cargo in its calculation of adequacy is the "more reasonable approach."[35] Yet if so, the Board gave no hint either to its existence or its shape, and I cannot accept my colleagues' attempt to give it form; that is the agency's job, not the court's.[36]
 
 
 92
 APL, the Board and the majority argue that the tonnage of United States-flag ships customarily devoted to carrying cargo in another country's commerce should be excluded from the computation of adequacy. Accordingly, only the capacity ordinarily utilized for United States-bound cargo would be compared to the total United States-bound cargo.[37] This interpretation reads Section 605(c) as a statement that "(n)o contract shall be made . . . unless the Secretary of Commerce shall determine . . . (that United States-flag ships are not customarily carrying substantial portions of all United States-bound cargo.)"
 
 
 93
 As a matter of statutory construction, this would seem reasonable if, as the majority appears implicitly to assume, the statutory purpose were simply to have much of the cargo in the stream of our foreign commerce routinely carried in United States-flag vessels. It can be argued that one purpose of the Merchant Marine Act of 1936 was merely to meet day-to-day foreign competition in commercial shipping,[38] but the argument mistakes means for ends.
 
 
 94
 The legislative history of the Act reveals that more United States-flag ships in operation was not an end in itself[39] but was a means of assuring that the vessels, and as well trained and experienced crews and shipbuilders,[40] would be available in an emergency.[41] Congress believed that having the ships on the open seas was preferable to having them in mothballs.[42] And it was obvious that to keep them sailing it would be necessary for our Government to provide operating subsidies to combat the lower operating costs of competing foreign-flag vessels and their subsidization by their own governments.[43]
 
 III
 
 95
 The preceding analysis seems rather unexceptionable, and it may well be that if APL had applied for increased subsidization for the increased service which it proposes to institute, my colleagues would agree that the application should have been denied. Perhaps at the heart of what bothers them is the fact that APL apparently is not asking for more money.[44] It asserts that it seeks simply to initiate a more efficient method of shipping containerization that would allow its currently subsidized vessels to make more voyages per year.[45] It would seem eminently sensible on pragmatic grounds to allow APL to give the Board and the Nation more capacity for the public dollars it is already receiving, and the court strives to garner this valuable benefit.[46] Nonetheless, the Board has decided that APL's request is subject to the requirement of a Section 605(c) hearing,[47] and APL has not challenged that holding here.[48] I am unwilling to distort the standards employed in Section 605(c) determinations to reach a wished-for practical result in a case to which the section perhaps should not be applied at all.[49]
 
 
 96
 My colleagues' main argument is that the statute should not be interpreted to give unsubsidized lines an undue competitive advantage and that, if adequacy is found in this case, only the unsubsidized lines could expand their services to meet increased demand.[50] To the extent that this is true, it remains true no matter how adequacy is defined if the facts of the given case meet that definition. Thus, by twisting the definition of adequacy with a view to finding inadequacy in this situation, the majority effectively reads the adequacy requirement out of Section 605(c) for this class of cases.
 
 
 97
 I cannot accept the majority's premise that unless inadequacy is somehow found, and consequently justification for approval of APL's application is established, the subsidized line is unfairly denied the chance to expand to enjoy the opportunities created by new demand. APL would not be prohibited from competing for that increased demand; it simply could not be subsidized in doing so if there is already adequate service. It may compete, and indeed it has competed,[51] on an unsubsidized basis, and the Act confines it to that role if existing service meets the minimum level of adequacy. Apparently what the court means is that because APL is not asking for any more dollars it in reality is merely another unsubsidized line with respect to the increased demand and should not be limited by its base-demand subsidization in seeking to meet the enlarged demand. This argument also gains its pragmatic force, if any, from the situation created by the Board's unchallenged conclusion that increases in service but not in subsidy are subject to Section 605(c).[52] I cannot accept this distortion of the Act on such a tenuous basis.
 
 IV
 
 98
 My colleagues praise the Board's "concern for the real world,"[53] and APL complains that the District Court's ruling would "produce an artificial and distorted result."[54] Although I agree completely that regulatory agencies should not "depart from this worldly context,"[55] both the majority and APL seem misguided as to which "real world" facts are relevant to the purposes of the Merchant Marine Act.
 
 
 99
 The court's formula does describe the volume of goods in our commerce carried from day to day in United States vessels, but the normal commercial world is not the world with which Congress was primarily concerned in enacting this legislation. Congress in 1936 looked toward a future world, but one as the events of 1939 to 1945 showed whose futurity did not make it any less real. The world with which Congress was preoccupied was a very real world of potential conflict in particular, a world in which foreign-flag service might, and undoubtedly someday would, be interrupted. And, in the view of Congress, our merchant marine is sufficiently fortified to protect against the dangers of that future reality if it can carry a substantial portion of our foreign commerce and can act as a naval and military auxiliary. The fact that something less than a substantial portion of our foreign commerce is routinely carried in United States-flag vessels is interesting but, on this record, is irrelevant to the statutory objectives.
 
 
 100
 It may be that a grant of APL's request is justified on some ground other than the Board's erroneous interpretation of what should guide a determination of adequacy, and I would give the Board an opportunity to remedy its deficiencies. For example, if it should find that, notwithstanding the inclusion in its equation of capacity routinely devoted to Canadian cargo, United States-flag service is inadequate, regardless of the numerical percentage arrived at, and that increased subsidized service will comport best with the purposes of the Act, we all would agree that it may grant the application.[56] But I cannot subscribe to the notion that the Board may set the amount of subsidized service by reference to factors bearing no apparent relationship to the purposes of the Act.
 
 
 
 [1]
 American President Lines, Ltd. (APL) is the successor by merger to American Mail Line, Ltd. (AML). The original application for subsidy was made in the name of AML on 3 June 1971; at this time, AML was a wholly owned subsidiary of APL. The merger took place on 1 October 1973. During the course of this opinion we shall refer only to APL, the current appellant, and will not make separate reference to AML as the original applicant
 The other appellants in this case are the Secretary of Commerce, Juanita M. Kreps, and Robert J. Blackwell and Howard F. Casey, members of the Maritime Subsidy Board. These officers are sued in their official capacity.
 
 
 [2]
 46 U.S.C. § 1101 et seq
 
 
 [3]
 Id. at § 1175(c). Under this section of the Act the Board is also required to determine that the award of an ODS contract will serve "the accomplishment of the purposes and policy of this Act . . . ." Id. For a discussion of these purposes, see Part II.D., infra
 
 
 [4]
 The other issues which were present at various stages in these proceedings are described in Brief for Appellant APL at 7-11. For our purposes it is important to recognize that the Canadian cargo issue is the only issue on which the District Court and the Board disagreed; this issue is, therefore, dispositive as to APL's application for an ODS subsidy award
 
 
 [5]
 Joint Appendix (J.A.) at 111-113. The authority vested in the Secretary of Commerce by the Merchant Marine Act has been delegated to the Maritime Subsidy Board
 
 
 [6]
 J.A. at 133-136
 
 
 [7]
 See generally States Marine International, Inc. v. Peterson, 171 U.S.App.D.C. 132, 518 F.2d 1070 (1975)
 
 
 [8]
 46 U.S.C. § 1101
 
 
 [9]
 The CDS subsidy is governed by Title V of the Act, 46 U.S.C. § 1151 et seq
 
 
 [10]
 46 U.S.C. § 1171(a) (emphasis added)
 
 
 [11]
 Id. at §§ 1171(a)(1), (2), (3), (4). See generally Bloomfield S.S. Co. Subsidy, Routes 13(1) and 21(5), 4 F.M.B. 305 (1953)
 
 
 [12]
 Id. at § 1171(a)
 
 
 [13]
 Id. at § 1121(a)
 
 
 [14]
 Id. at § 1173(a). It is important to note that the subsidy is paid to the carrier and not to the shipper
 
 
 [15]
 See id. at § 1173(b)
 
 
 [16]
 46 U.S.C. § 1175(c)
 
 
 [17]
 See Final Decision of the Board, J.A. at 86-87
 
 
 [18]
 We wish to emphasize that the 50% Figure is a general guideline to determine adequacy; it is not conclusive on this issue. As the Board has stated, "the 50% Rule of thumb is very far from a binding limit on § 605(c) clearance. It is not a rigid bar to subsidy. . . . To the contrary, § 605(c) is no bar to service that will move U. S.-flag participation up to 'the highest percentage practically available.' " United States Lines Subsidy, Route 12, 5 S.R.R. 969, 977 (1965)
 Section 605(c) uses the term "inadequate" without providing any guideposts as to the practical meaning of the term. The Secretary of Commerce has specifically tied the adequacy determination to the criterion set forth in section 101(a) of the Act, 46 U.S.C. 1101(a). That is, service is adequate if it is "sufficient to carry a substantial portion" of U. S. foreign commerce. See Atlantic Express Lines of America, Inc., 2 S.R.R. 725, 732-733 (Sec.Comm.1963). The term "substantial" has in turn been interpreted to mean 50%. This information is provided in order to explain the derivation of the 50% Rule of thumb.
 The Board in this case explicitly recognized that U. S.-flag carriage in excess of 50%, if practically attainable, was no bar to § 605(c) clearance. See J.A. at 116.
 
 
 [19]
 For a fuller statement as to the nature of the application filed by APL, see Initial Decision of the Administrative Law Judge, J.A. at 4-9
 
 
 [20]
 See Brief for the Federal Appellants at 9
 
 
 [21]
 Id. at 9-10
 
 
 [22]
 See Brief for Appellant APL at 13-14
 
 
 [23]
 Containership cargo is general cargo pre-loaded in large containers which may be directly transferred in such containers from truck trailers to specially-built "containerships," or vice versa. It is to be distinguished from breakbulk general cargo, bulk dry cargo, and bulk liquid cargo, which are respectively carried on breakbulk freighters, bulk carriers, and tankers. Containerships and breakbulk freighters may be used in either "liner" service (regular scheduled service), or "non-liner" (irregular or tramp) service
 
 
 [24]
 The trade route between the U. S. Pacific Northwest and Indonesia, Malaysia and Singapore is Trade Route No. 17 and is only peripherally involved in these proceedings
 
 
 [25]
 This results from the fact that the subsidy is figured according to the number of vessels, not the number of voyages
 
 
 [26]
 The Board used containership cargo figures since this form of cargo was expected to predominate by 1975. See J.A. at 96, 101
 
 
 [27]
 The Board used inbound figures in this case because the inbound cargo was greater than the outbound cargo. See J.A. at 116-117
 
 
 [28]
 J.A. at 111
 
 
 [29]
 J.A. at 114, 115. Gross vessel capacity is reduced by 10% To arrive at net vessel capacity in these proceedings. See J.A. at 115
 
 
 [30]
 J.A. at 114, 115
 
 
 [31]
 Thus, if the Board granted no additional authority for sailings on Trade Route 29, there theoretically would be insufficient vessel capacity to transport the combined Canadian and American cargo projected to be available
 
 
 [32]
 J.A. at 3
 
 
 [33]
 J.A. at 31-32, 48
 
 
 [34]
 The arithmetic is as follows:
 432,000 tons--total U.S. capacity
 755,000 tons--total available cargo inbound to U.S.
 
 
 [35]
 J.A. at 84
 
 
 [36]
 J.A. at 112-113
 
 
 [37]
 One-half of the available Canadian cargo for 1975 is equal to 168,000 long tons; when this figure is subtracted from the total net U. S. capacity of 432,000 long tons, the capacity of U. S. ships to carry cargo inbound to U. S. ports is reduced to 281,000 long tons. When this figure of 281,000 is compared to the available inbound cargo destined for U. S. ports, the 37% Figure results
 
 
 [38]
 J.A. at 116
 
 
 [39]
 The calculation is as follows: the 514,000 ton capacity is reduced in recognition of the space to be devoted to Canadian cargo; the resulting figure of 363,000 tons, when compared with the 755,000 tons of available cargo, yields the 48% Figure
 
 
 [40]
 J.A. at 116-117
 
 
 [41]
 J.A. at 130
 
 
 [42]
 Complaint, P 18c; see Brief for Federal Appellants at 21
 
 
 [43]
 APL intervened in No. 76-1204; this has been consolidated with No. 76-1389 in this appeal
 
 
 [44]
 J.A. at 135
 
 
 [45]
 If this were a direct appeal from the agency decision as was the case when the District Court was reviewing the agency action the proper standard of review would be whether the decision of the agency was "arbitrary, capricious, (or) an abuse of discretion . . .." 5 U.S.C. § 706. If the Board was operating within the bounds of the Act, we cannot see how the action that it took could be so characterized. Thus, if we are incorrect as to the basis of the District Court's decision, we would still reverse the order of the District Court for failing to defer to a reasonable interpretation by the agency of the statute which it is charged with administering
 It is worth noting that the parties appear to agree that this case centers on an issue of statutory construction. See Brief for Federal Appellants at 23 n. 31; Brief for Appellant APL at 11-13; Brief for Appellee at 7.
 
 
 [46]
 Del. & Hudson Ry. Co. v. United Trans. Union, 146 U.S.App.D.C. 142, 159, 450 F.2d 603, 620-21, cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971)
 
 
 [47]
 Id
 
 
 [48]
 See Brief for Appellant APL at 13-14
 
 
 [49]
 See Brief for Appellee at 12; Brief for Appellant APL at 13-14; Brief for Federal Appellants at 25-26
 
 
 [50]
 Appellee Sea-Land contends that an examination of the policy and purposes of the Act are "irrelevant" to the disposition of the statutory construction issue before this court in this case. Brief for Appellee at 11-12, 16. Appellee is, of course, totally incorrect in this regard. There are numerous issues to which Congress does not speak when it enacts legislation; the accepted method of determining the lawfulness of a particular interpretation for which there is no direct statutory guidance is to test the interpretation for consistency with the purpose of the legislation
 Appellee is correct in its assertion that the requirement of section 605(c) that each ODS award be made for "the accomplishment of the purposes and policy of this Act . . ." is an independent determination. See Brief for Appellee at 16. This determination is to be made independently of the adequacy determination; that is, there are two independent requirements (inadequacy and furtherance of the Act's policies) to be made before an ODS award can be made. This independence between the two statutorily-mandated requirements does not, however, mean that issues of statutory construction can be decided "independently" of the purposes and policies of the Act.
 
 
 [51]
 J.A. at 87
 
 
 [52]
 American Export Lines, Inc., 14 S.R.R. 1539, 1552 (1975)
 
 
 [53]
 See Bloomfield S.S. Co. Subsidy, Routes 13(1) and 21(5), 4 F.M.B. 305, 317 (1953) ("The standard of adequacy must be consistent with the realities of each particular route and with the purposes of the Act.")
 
 
 [54]
 See text and notes at notes 26 to 31, supra
 
 
 [55]
 Such was the result reach by the ALJ and the District Court in this case by comparing total U. S. vessel capacity with total U. S. cargo. See text and notes at notes 32 to 34, supra
 
 
 [56]
 The point deserves emphasis that the Board's ruling in this case permits APL to increase its sailings so as to carry available trans-Pacific cargo on Trade Route 29
 
 
 [57]
 46 U.S.C. § 1101(a)
 
 
 [58]
 Brief for Appellee at 8-9
 
 
 [59]
 See note 13, supra
 
 
 [60]
 See text and notes at notes 48 to 49, supra
 
 
 [61]
 See notes 27 and 28, supra
 
 
 [62]
 The necessity of meeting such foreign flag competition is a requirement for an ODS subsidy. See 46 U.S.C. § 1171
 
 
 [63]
 46 U.S.C. § 1101(b)
 
 
 [64]
 See, e. g., Hearings on H.R. 7521, 74th Cong., 1st Sess. (1935) at 694 (remarks of Rep. Welch)
 
 
 [65]
 S.Rep.No.1721, 74th Cong., 2d Sess. (1936) at 5
 
 
 [66]
 Hearings on S. 3500, 74th Cong., 2d Sess. (1936) at 75, 76 (remarks of Shipping Board Bureau Director Peacock)
 
 
 [67]
 See note 42, supra
 
 
 [68]
 Brief for Appellee at 18
 
 
 [69]
 See text and notes at notes 56 to 65, supra
 The position of our dissenting colleagues is based on the erroneous assumption that the objectives of the Merchant Marine Act are automatically met by a U. S.-flag fleet sufficient to carry only one half of the U. S. cargo on any given essential trade route. He misconstrues the objectives of the Act and the role that the Act plays to achieve those objectives. The Act's declaration of policy states that "it is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic waterborne and a substantial portion of the water-borne export and import foreign commerce of the United States . . . ." Observe that it is "necessary" that a U. S.-flag fleet carry all of the domestic commerce and a substantial portion of the foreign. Both of these necessities are relevant to the twin objectives of "maintaining the flow of such domestic and foreign waterborne commerce at all times, (and) (b) capable of serving as a naval and military auxiliary in time of war or national emergency . . . ."
 Nowhere in the statute is the figure of 50% Of the export and import foreign commerce used. This has been taken as a rule of thumb equivalent to the statutory mandate of "a substantial portion." Both the statutory language and the operating rule of thumb 50% Recognize implicitly the economic realities in the situation. It is not only necessary but also possible for the United States to provide for a merchant marine carrying all of its own domestic waterborne commerce, but it is not realistic to expect in a highly competitive world the United States to carry much more than 50% Of its foreign commerce even though for economic emergency and national defense purposes it would be highly desirable to have all foreign commerce carried in American ships. The economic realities are that buyers of our goods and shippers to the United States may have some claim of their own to designate the flag vessels in which such commerce is carried; therefore, a rule of thumb target of 50% Of such commerce is a practical commercial expression of the statutory mandate of "a substantial portion of the water-borne export and import foreign commerce of the United States."
 As this opinion points out, "Carriage of 50 per cent or more of the available U. S. foreign commerce by U. S.-flag vessels will be considered adequate unless a higher percentage is feasible." (p. --- of --- U.S.App.D.C., p. 767 of 566 F.2d) As the Board has stated, ". . . section 605(c) is no bar to service that will move U. S. flag participation up to 'the highest percentage practically available.' " Note 18, supra.
 Thus, when we have a situation (as on the U. S. and Canada to the Far East trade route) where U. S., Canadian, and other foreign flag vessels regularly pick up or deliver cargo at U. S. and Canadian ports on the same voyage, then it is economically and commercially feasible to calculate the rule of thumb 50%, i. e., the statutory "substantial portion" objective, as capacity to carry 50% Of all the cargo available on the trade route. Or to make the calculation another way, as the Board did here, it is both feasible and logical to remove from the estimated capacity of U. S.-flag ships that portion of capacity which is devoted to the carrying of Canadian cargo, thus leaving for the available U. S. cargo only that portion of the U. S.-flag fleet not otherwise already committed. On this latter calculation the available U. S.-flag capacity of 37% Obviously is inadequate. And, since we are considering available U. S. cargo in ratio to available U. S.-flag capacity, it is commercially feasible to think about increasing this 37% Capacity to something approaching 50%, i. e., the 48% Which the Board contemplated as a result of its decision in favor of the appellant's increased voyages.
 In summary, our dissenting colleague's position takes the 50% Commercially practical goal in the usual circumstances (U. S. capacity to U. S. cargo only) as a total fulfillment of the objectives and policies of the Merchant Marine Act, which it never is unless a higher percentage of carriage by American flag vessels is simply not commercially feasible. The present situation is an example of a higher ratio of U. S.-flag capacity to purely U. S. cargo being commercially feasible, because U. S.-flag capacity fortunately is successfully competitively engaged in carrying Canadian cargo. As the Board has repeatedly said, where it is possible, then the policies and objectives of the Act call for increased American tonnage, because 50% Capacity for all U. S. cargo in foreign commerce can never provide 100% Of U. S. needs in either an economic or military emergency. We settle for 50% Of the foreign (but not domestic) waterborne commerce under normal peacetime conditions because that is usually all that is commercially feasible to obtain for U. S. ships; it has been held to satisfy the statutory mandate of "substantial portion" under normal conditions.
 Of course, as our dissenting colleague points out, in an economic or military emergency our U. S.-flag vessels might well drop their carriage of Canadian cargo. In such event, regrettably the U. S.-flag tonnage available, even after the Board's decision is implemented, would not be nearly sufficient to carry all of the U. S. cargo normally generated. What the Board's decision, which we uphold, does here does not approach 100% Insurance for an emergency; it only increases that emergency capacity insurance to a level higher than 50% Of purely U. S. cargo by taking advantage of the commercial situation to provide capacity to approximately 50% Of all (U. S. and Canadian) cargo normally available to U. S. ships, a reasonable commercial prospect satisfying the statutory "substantial portion."
 
 
 [1]
 Act of June 29, 1936, ch. 858, 49 Stat. 1985, as amended, 46 U.S.C. §§ 1101-1294 (1970 & Supp. V 1975)
 
 
 [2]
 Merchant Marine Act of 1936, tit. V, 46 U.S.C. §§ 1151-1161 (1970 & Supp. V 1975)
 
 
 [3]
 Id. tit. VI, 46 U.S.C. §§ 1171-1183a
 
 
 [4]
 The Secretary of Commerce has delegated her authority under the Act to the Maritime Subsidy Board. See 46 C.F.R. § 252.13 (1976). The Secretary denied a petition to review the Board's decision in this case
 
 
 [5]
 Merchant Marine Act of 1936, § 601(a)(1), 46 U.S.C. § 1171(a)(1) (1970)
 
 
 [6]
 E. g., S.Rep. No. 1721, 74th Cong., 2d Sess. 7, 10 (1936); S.Rep. No. 748, 74th Cong., 2d Sess. 3 (1935); H.R.Rep. No. 1277, 74th Cong., 2d Sess. 3, 12-17 (1935); Hearings on H.R. 7521 Before the House Comm. on Merchant Marine and Fisheries, 74th Cong., 1st Sess. 61-62 (1935) (testimony of Alfred E. Haag, Chief, Division of Shipping Research, United States Shipping Board Bureau) (hereinafter cited as "House Hearings ")
 
 
 [7]
 See Sea-Land Serv., Inc. v. Connor, 135 U.S.App.D.C. 306, 313, 418 F.2d 1142, 1149 (1969) ("since these grants are a part of the government wealth, it is incumbent upon the Secretary to follow sound administrative procedures to determine the necessity of expenditures and thereby serve the master, public interest")
 
 
 [8]
 46 U.S.C. § 1175(c) (1970)
 
 
 [9]
 Sections 601 and 605(c) appear on their face to establish three basic standards for subsidization. When the line seeking the subsidy desires to institute new service on a route already served by another United States line, it must show that the existing service is inadequate to meet the purposes of the Act. Merchant Marine Act of 1936, § 605(c), 46 U.S.C. § 1175(c) (1970). This differs from the showing requisite in the absence of service on the route by another United States line. In that case, the Commission in its discretion may subsidize United States-flag capacity that exceeds the bare minimum necessary for achievement of the purposes of the Act. See id. § 601(a), 46 U.S.C. § 1171(a). This distinction is soundly based upon the desire to preserve and promote existing lines if possible, and on the fear that subsidies might eventually drive out unsubsidized lines. H.R.Rep. No. 1277, supra note 6, at 23 (purpose of § 605 (then-s 535) is "to protect operators on existing routes"); cf. Pacific Far East Line, Inc. v. Federal Maritime Bd., 107 U.S.App.D.C. 155, 156, 275 F.2d 184, 185, cert. denied, 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523 (1960) (Congress intended to prevent subsidized lines from diverting subsidy funds to unsubsidized domestic operations "to the disadvantage of an unsubsidized operator"). See generally Whitehurst, The Merchant Marine Act of 1936: An Operational Subsidy in Retrospect, 8 J.L. & Econ. 223, 240-242 (1965) (despite safeguards, subsidization drove out many unsubsidized lines over time). As the Board's predecessor said in one of the earliest interpretations of the Act:
 We have stated as a matter of policy that we prefer that private United States-flag operations be conducted in the foreign trade without Government aid, but we will enter into contracts for the payment of operating-differential subsidies, in accordance with the provisions of the law, whenever this is found necessary to maintain adequate United States-flag service on essential foreign trade routes.
 Bloomfield S.S. Co., 3 F.M.B. 299, 306 (Maritime Comm'n 1946); accord, American South African Line, Inc., 3 F.M.B. 314, 321 (Maritime Comm'n 1947) ("it should be understood, however, that the Commission would not pay a subsidy to an American-flag operator for operating an essential foreign service that could and would be adequately maintained on a long-range basis by an American-flag operator without subsidy"). If current service is below the minimum level of adequacy, the Board cannot afford to confine operations on the route to existing lines, but otherwise their interests and the desire to avoid unnecessary expenditures should normally triumph. Final Opinion and Order of the Maritime Subsidy Board, Joint Appendix (J.App.) 87 (hereinafter cited as "Board Opinion"); Brief for Federal Appellants at 26-28; see Hearings on S. 2582 Before the Senate Comm. on Commerce, 74th Cong., 1st Sess. 512, 547 (1935) (hereinafter cited as "Senate Hearings on S. 2582 ") (finding of inadequacy referred to as "certificate of necessity"); House Hearings, supra note 6, at 691, 737 (testimony of Ira A. Campbell, counsel for the American Steamship Owners Association and draftsman of the original version of § 605(c) ) ("it is not sound for the Government to subsidize two carriers to go into competition with each other" unless "it is necessary so that Americans will be able to carry 50 percent or 51 percent of her commerce").
 A middle category involves situations in which the service sought to be subsidized was being provided by the applicant on an unsubsidized basis prior to the subsidy application, and another United States line was also providing service on the same route. Merchant Marine Act of 1936, § 605(c), 45 U.S.C. § 1175(c) (1970); Brief for Federal Appellants at 7 n.2. There, if foreign operating costs are low enough to justify a subsidy, the Board has discretion to grant one even though the aggregate service is adequate, unless the other existing line shows that the subsidy would be "unduly prejudicial." Pacific Transp. Lines, Inc., 4 F.M.B. 7, 19-20 (Bd.1952). The assumption seems to be that when both lines are already providing service the demand must be such that the other line is less likely to be injured than it might be if new or additional service were being sought. Thus, the desire to assure that the applicant for the subsidy is not forced to abandon its service is given greater weight.
 To summarize, if the current service is inadequate to meet the Act's goals, subsidization is allowed regardless of the presence of United States-flag competitors. If it is inadequate but there are no such competitors, the Board may still grant a subsidy through a § 601 determination. If existing service is adequate and both lines provided prior service, the line not seeking a subsidy must show enough to warrant a § 605, cl. 2, determination that it would be unduly prejudiced. Finally, if existing service meets the minimum threshold of adequacy, and the line seeking the subsidy did not serve the route prior to its application, a § 605, cl. 1, denial of the subsidy will generally be in order. See generally The Ocean Freight Industry, Report of the Antitrust Subcomm. of the House Judiciary Comm., 87th Cong., 2d Sess. 354 (1962) (hereinafter cited as "The Ocean Freight Industry ").
 This synopsis of the statute seems to conflict, at least on its face, with a number of recent Board decisions indicating that even if the existing service is adequate the Board may approve subsidization to attain even greater United States-flag capacity. E. g., United States Lines, 5 S.R.R. 969, 977 (Bd.1965). As may appear from my discussion in note 19 infra, however, these cases might simply mean that a higher standard of adequacy is appropriate if excess overall demand makes increased United States-flag subsidized service "practically available" with little or no injury to unsubsidized lines. In effect then, the presence of excess demand might result in a situation more closely analogous to that contemplated by clause 2 of § 605(c) than by clause 1.
 
 
 [10]
 American Mail Lines, the original applicant, was merged into APL just before the Board's decision. See Brief for Appellant APL at 4
 
 
 [11]
 The Board rejected APL's contention that, because APL had instituted unsubsidized service after applying for the subsidy, its application should be viewed as one seeking subsidization of existing service and accordingly judged under the second clause of § 605(c). Board Opinion, J.App. 88. APL did not challenge that conclusion in the District Court
 
 
 [12]
 The general route in question is Trade Route 29, which includes shipping between United States Pacific ports and ports in the Far East. Initial Decision of Eugene E. Hunt, Administrative Law Judge, J.App. 4 n.1 (hereinafter cited as "Initial Decision"). This dispute particularly involves ships calling at the Pacific Northwest ports of Seattle, Tacoma and Portland
 
 
 [13]
 See text infra at notes 46-49 for a discussion of the applicability of § 605(c) in this context
 
 
 [14]
 46 U.S.C. § 1175(c) (1970)
 
 
 [15]
 Although we yield "great deference to the interpretation given (a) statute by the officers or agency charged with its administration," Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965), that deference is more emphatically summoned when the question is one requiring expertise in the subject area, such as a dispute over whether the agency's policy satisfactorily fulfills the statutory aims. The question here, however, is what those purposes are, and "the courts are the specialists, whether analysis of legislative history is called for, or whether the main process is one of finding the meaning of the words." K. Davis, Administrative Law Treatise § 30.09, at 243 (1958); accord, Wilderness Soc'y v. Morton, 156 U.S.App.D.C. 121, 143-144, 479 F.2d 842, 864-865 (en banc ), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973) (agency construction contrary to congressional intent must be overturned). The Board's interpretation, moreover, was not adopted contemporaneously with enactment of § 605(c), is not a longstanding construction, and has not been implicitly relied upon by Congress, see NLRB v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134, 143 (1974), and therefore it does not bear those characteristics calling for maximum judicial deference. Indeed, this appears to be the first time this issue has arisen, and the Board's implicit decision to deemphasize the purposes of the Act when interpreting what is "inadequate" contradicts earlier decisions by itself and its predecessor. See cases cited in notes 16 and 24 infra. Lastly, it is hard to extend deference to a conclusion lacking reasoned explication. See note 19 infra and text infra accompanying note 36. It is impossible to be sure that the Board construed the Act in light of the congressional objectives or whether it merely decided, without reference to the Act, that it would be more "reasonable" to decide the way it did. see note 35 infra
 
 
 [16]
 Bloomfield S.S. Co., 4 F.M.B. 305, 317, 324 (Bd.1953) (standard of adequacy must be established in light of the purposes of the Act); accord, Majority Opinion (Maj. Op.), text at note 18; American President Lines, Ltd., 4 F.M.B. 681, 695 (Bd.1955). As the author of the original language of § 605(c) explained his proposal:
 If the service is inadequate, then the new contract should be made. If additional vessels should be operated to accomplish the purposes of this whole Act, the permission should be given.
 Senate Hearings on S. 2582, supra note 9, at 512 (testimony of Ira A. Campbell, counsel for the American Steamship Owners' Association).
 
 
 [17]
 As the court points out, the determination of adequacy must relate to the purposes of the Act. Maj. Op., text at notes 18, 50. The Board's disagreement with that conclusion is totally semantic. It may be that the Board has employed the 50% Guideline, see note 25 infra, so often that it has forgotten why it is employed; that it has made "adequacy" determinations so often that it has forgotten why it is doing so. This is indicated by the Board's opinion in this case, wherein it explained the difference it perceives between "adequacy" and "purpose-fulfillment" with an "extreme example." Board Opinion, J.App. 123. The example was "the time period preceding the entrance into war by the United States when our allies are engaged in hostilities and our ships are supplying them with goods while 'competing' against the few foreign-flag ships plying the embattled seas." Id. The Board felt that in such circumstances a subsidy could be granted even though the United States-flag shipping was found to be adequate. Id. In what way the shipping could possibly be deemed adequate was left wholly unelucidated. The only way it can be explained is that the Board slavishly adheres to the 50% Figure despite the facts of the particular situation and the goals of the Act
 On the other hand, "adequacy" and "the accomplishment of the purposes and policy of this Act" must be independently ascertained in one situation. That is where the existing service is found to be in adequate. The Board cannot grant a subsidy solely on the basis of inadequacy of shipping in a hypothetical crisis, but must still see that the other conditions and considerations of the Act, such as those in § 601(a), are met. The Board believes that some of these other "purposes and policy" matters, such as financial feasibility and subsidy costs, are not within the scope of a § 605(c) hearing, Board Opinion, J.App. 124, but we are not called upon today to review that conclusion.
 
 
 [18]
 Philbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525, 532-533 (1975), quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009, 1013 (1849)
 
 
 [19]
 Both the Board and my colleagues tend to confuse adequacy to meet the Act's purposes with the adequacy of the total supply of shipping to meet the demand of all cargo shippers. See especially Maj. Op. at note 69. If there is statutory inadequacy, the Act makes overall demand inadequacy irrelevant: Even if the total all-flag supply of shipping is adequate for the existing demand, the Board, in the event of statutory inadequacy, must still subsidize the operation of United States-flag vessels, which then presumedly would successfully compete with foreign-flag ships for the existing demand
 If there is the minimum level of statutory adequacy and no existing service by a United States-flag line, the Board may of course inform its discretion to subsidize operations above the minimum level by looking to whether overall demand exceeds overall supply. In such a situation, the Board could reasonably conclude that inadequacy of supply enhances the chances for success of increased subsidized service.
 If there is a competing United States-flag line, however, the language of § 605(c) prohibits further subsidization once a minimum level of adequacy is established. This the court completely disregards. Its rationale rests almost totally on the premise that an increase in subsidized United States-flag service is "commercially feasible." Maj. Op. at note 69. That is an important factor under § 601, but under § 605(c), even if a subsidized line could succeed economically on a given route, the subsidy must be denied if existing service is "adequate" and if the subsidized line's success would come at the expense of an unsubsidized line. And even as to § 601 itself, Congress by calling for United States-flag service for a "substantial portion" of our commerce obviously intended that subsidies not be granted for service sufficient to carry all our trade although that service would be "commercially feasible." Congress knew that there is a point of disutility at which the cost of subsidization is not justified by the marginal gains in protection against emergencies. And although it delegated to the Board the task of determining that point in each individual case, it did not direct the Board to shower tax dollars on every ship operator who can come up with a commercially feasible proposal, especially if that proposal would result in harmful competition with operators hearty and independent enough to do without a subsidy. The court today decides that "it would be highly desirable to have all foreign commerce carried in American ships," Maj. Op. at note 69, and that that goal is so desirable that the Federal Government should pay for it, whatever the ultimate cost. I cannot agree that Congress has embarked upon any such thing.
 Nonetheless, the fact that overall demand exceeds overall supply, one aspect of commercial feasibility, might indicate that further subsidization would not substantially injure the unsubsidized line. Because one important aim of § 605(c) is to fend off unnecessary injury to unsubsidized lines, it might be prudent for the Board, defining adequacy in light of the statute's mix of purposes, to raise the adequacy standard where there is excess overall demand. Cf. Matson Nav. Co. v. Connor, 258 F.Supp. 144, 157 (N.D.Cal.1966), aff'd per curiam, 394 F.2d 514 (9th Cir.), cert. denied, 393 U.S. 998, 89 S.Ct. 482, 21 L.Ed.2d 463 (1968) ("residual" benefit to a company's domestic carriage resulting from subsidization of voyages stopping at both domestic and foreign ports did not result in "unfair competition" with domestic carrier because "the California-Hawaii trade will grow enough to accommodate both"). This seems to be what is behind the Board's decisions that it can approve requests resulting in greater service than is called for by the general guidelines for adequacy of United States-flag capacity even though there is existing service. See cases discussed in note 9 supra. If indeed that is the Board's guiding rationale, I for one would benefit from more careful choice of its language. "Overtonnage" and "adequacy" have little or no meaning when set adrift from a particular context of capacity versus demand or capacity versus statutory purposes.
 My colleagues appear to rely on the Board's projection of excess demand to support their approval of its decision. At --- of --- U.S.App.D.C., at 772 of 566 F.2d. Yet the Board did not itself rest the decision on that basis and it is firmly settled that "(t)he premises upon which the validity of an administrative order is to be decided are only those upon which the agency predicate(s) its action." Tygrett v. Washington, 177 U.S.App.D.C. 355, 362, 543 F.2d 840, 847 (1974), and cases cited in note 49 thereof. "(A) simple but fundamental rule of administrative law (is) that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947); accord, Westminster Broadcasting Corp. v. FCC, 148 U.S.App.D.C. 332, 336, 459 F.2d 1356, 1360 (1972). And a reviewing court is not free to advance "an alternative, unstated ground to support an agency's decision if that ground is one that 'the agency alone is authorized to make.' " Gulf States Utils. Co. v. FPC, 411 U.S. 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635, 647 (1973), quoting SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943).
 Moreover, even assuming that the statute does not prohibit the approach taken by the majority, I am unwilling to speculate that the Board would both adopt the majority's rationale and find it applicable here. For instance, an unsubsidized United States-flag carrier, such as Sea-Land, might be able to supply the excess demand, see at --- of --- U.S.App.D.C., at 773 of 566 F.2d, and the policy of § 605(c) may require that it be given the chance to do so at the expense of the subsidy applicant. See cases discussed in note 9 supra.
 The Board assumed that Sea-Land might suffer some detrimental effect but that the impact was acceptable because, as an unsubsidized line, Sea-Land could move its ships to a different route with greater ease than could APL. Board Opinion, J.App. 129. This course of reasoning pays scant heed to the Act's plain demand that, whenever possible, foreign-flag carriers, and not unsubsidized United States lines, suffer competitive injury at the hands of subsidized vessels. Furthermore, Sea-Land should not be made to suffer from APL's inability to respond quickly to competitive conditions caused by the Board's cumbersome regulation of subsidized lines.
 
 
 [20]
 Brief for Appellant APL at 24
 
 
 [21]
 Id. at 25
 
 
 [22]
 46 U.S.C. § 1101 (1970). The 1936 Act adopted the goals of two earlier statutes, H.R.Rep. No. 1277, supra note 6, at 3-4, which called for a United States merchant marine "sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or national emergency." Merchant Marine Act of 1920, § 1, 46 U.S.C. § 861 (1970); see Merchant Marine Act of 1928, ch. 675, Pub.L. No. 70-463, § 1, 45 Stat. 689 (1928) (adopting purposes of the 1920 Act)
 
 
 [23]
 E. g., 80 Cong.Rec. 10571 (1936) (Representative Moran) (discussing national defense and threat of cutoff of foreign shipping); id. at 9904-9906 (Senator McAdoo) (same); id. at 9899 (Senator Guffey) (same); 79 Cong.Rec. at 10290 (1935) (Representative Crowe) (same); id. at 10258 (Senator Copeland, Chairman of the Senate Committee) (same); id. at 10207 (Representative Ramspeck) (national defense); id. at 10107 (Representative Wigglesworth) (same); id. at 10095 (Representative Welch) (same); id. at 10089 (Representative Connery) (same); id. at 10088 (Representative Bland, Chairman of the House Committee) (same); id. at 10075-10076 (Senator Fletcher) (same); S.Rep. No. 1721, supra note 6, at 5 ("(i)f a match should be set to this tinderbox of national jealousies and conflicting ambitions, a large part of the foreign merchant fleet upon which the United States depends for carrying two-thirds of its foreign commerce would be withdrawn from this service, and the products of our American farms would again lie rotting in the fields or on wharves as they did in 1914 to 1917, and our warehouses would bulge with the unsold products of our factories. There would not be sufficient ships to carry them"); H.R.Rep. No. 1277, supra note 6, at 4-5 (discussion of the two purposes); S.Rep. No. 713, 74th Cong., 1st Sess. 7 (1935) (same); House Hearings, supra note 6, at 833-834 (Alfred E. Haag, Chief of the Division of Shipping Research, United States Shipping Board Bureau) ("we should have proper representation upon the seas so that we need not rely upon foreign shipping in the case of a national emergency or be deprived of effective means to compete in world markets"); id. at 47-48, 62-65, 121-125 (discussion of effects of wars on merchant marine); id. at 1239 (text of radio address by Secretary of Commerce Roper) (adequate merchant marine is necessary to protect commerce and national defense in event of war or other emergency); id. at 1236 (text of radio address by Representative Walsh) (same); H.Doc. No. 118, 74th Cong., 1st Sess. 1 (1935) (message from President Roosevelt) (discussing purposes of proposed legislation); id. at 16-17 (General Report of the Postmaster General to the President) (discussing war-time concerns); id. at 21, 25-27 (Report of the Interdepartmental Committee on Shipping Policy) (discussion of need for strong merchant marine to support national defense and development of commerce)
 The purposes behind federal subsidization of a privately owned merchant marine were most clearly and logically explained by then-Senator Hugo L. Black, who noted that the objectives of such subsidies are:
 To make certain that American farmers, manufacturers, and all American producers of goods can transport their products to foreign markets, regularly, speedily, and at reasonable cost regardless of economic or war disturbances in any part of the world.
 To make available constantly an efficient and sufficient fleet of potential naval auxiliaries, manned by American citizens, whose ability, training, courage, and loyalty will assure the successful operation of the fleet in time of peace as well as war.
 In accomplishing the foregoing to give steady employment to American working men in shipyards and industries supplying shipbuilding material and the plants wherein they work, thus keeping ready for instant action the means of rapid ship construction in time of emergency.
 S.Rep. No. 898, 74th Cong., 1st Sess. 2 (1935). Whether the two primary statutory goals carry the same weight now as they did in 1935 and 1936 might be open to question. G. Gilmore & C. Black, Law of Admiralty 977 (2d ed. 1975) ("new patterns of power, by making long distance land wars unwinnable, may have affected drastically the indispensable premise of all ship construction and shipping subsidy legislation the premise that a national carrying fleet is essential to the defense and to national power").
 
 
 [24]
 Lykes Bros. S.S. Co., 4 F.M.B. 455, 464 (Bd.1954)
 
 
 [25]
 Bloomfield S.S. Co., supra note 16, 4 F.M.B. at 317 (50% Guideline based on legislative history of Merchant Marine Act); accord, Board Opinion, J.App. 116-117
 
 
 [26]
 Merchant Marine Act of 1936, § 101, 46 U.S.C. § 1101 (1970)
 
 
 [27]
 Id
 
 
 [28]
 Id. §§ 211, 601(a), 46 U.S.C. §§ 1121(a), 1171(a). In determining that a route was essential, the Board has looked to whether the cargo transported over the route was so important to our economy that it would be dangerous for the United States to be "dependent upon a transportation system over which it had virtually no control." American President Lines, 3 F.M.B. 457, 462 (Bd. & Maritime Admin.1951)
 
 
 [29]
 Maj. Op., text accompanying note 22
 
 
 [30]
 Maj. Op. at note 65 and accompanying text
 
 
 [31]
 See text accompanying notes 20-23 supra
 
 
 [32]
 Inbound cargo alone was considered because the amounts of cargo already containerized and susceptible to containerization were greater inbound than outbound. Board Opinion, J.App. 116-117
 
 
 [33]
 Thus, the total projected capacity of United States-flag vessels, 432,000 long tons, should have been compared to the projected United States-bound cargo, 755,000 long tons, a ratio of 57%. Because this exceeds the Board's 50% Guideline, no one seriously contends that the Board's error, if any, was harmless. No argument appears to have been made that the United States suffered appreciably from a lack of shipping capacity during the years of the Vietnam War
 
 
 [34]
 Of course, in an emergency, the country to which the wayport cargo heads might well be our ally, and we might want to continue carrying its cargo so as not to disrupt its economy. But the Board did not make such a determination in this case, and it is not our place to make it, even if we had the information to do so. There is not, for example, any data in the record as to what amount of the United States-bound cargo, if any, is routinely carried in Canadian-flag vessels or in the vessels of our other traditional allies. If the assumption is that we must be prepared in a crisis to carry our allies' goods as well as our own, it seems equally logical to assume that they will continue to carry our goods as well as their own. Furthermore, despite our commitment to the country in question, such a foreign policy decision might be one that neither the Board nor this court is capable of making. Finally, Congress might have taken away from the Board the power to undertake such a decision. A proposal to amend the bill that became the Merchant Marine Act to incorporate as its purpose an assurance that the United States-flag fleet would be adequate to carry a substantial portion of the commerce of the United States and of the rest of the world was not accepted by Congress in 1936. Hearings on S. 3500 Before the Senate Comm. on Commerce, 74th Cong., 2d Sess. 298-299 (1936) (testimony of Victor B. Bendix, ship and freight broker)
 
 
 [35]
 Board Opinion, J.App. 113. The Board's rationale is very unclear. Its entire discussion of the issue was:
 Even if we assume, for present purposes, that Section 605(c) does not permit to be considered in the pool of cargo any cargo "external" to the U. S. foreign commerce, the Judge's treatment of Canadian cargoes is in error. In a determination of ship container capacity to containerized cargo, Canadian cargo, which the parties did carry in 1970 and which there is no evidence to indicate they will not carry in 1975, must be recognized. The Judge accepted (APL's) and other ship operators' container capacity without making any reduction for this cargo (it does not appear that the parties other than (APL) made any such reduction), but he excluded it from the 1975 pool of containerized cargo. A more reasonable approach is to provide for a reduction in ship container capacity with no reduction in the pool of cargo of containerized cargo.
 Board Opinion, J.App. 112-113. It is agreed by all that the Board did not mean "with no reduction in the pool of containerized cargo," and that what it instead had in mind was "along with a reduction in the pool of containerized cargo." Brief for Federal Appellants at 18 n.26.
 
 
 [36]
 See note 19 supra
 
 
 [37]
 Total cargo inbound to the United States was projected for 1975 at 755,000 long tons, and the projected 1975 capacity customarily devoted to United States-bound cargo, without approval of APL's application, of United States-flag vessels was 281,000 long tons. This resulted in a ratio of approximately 38%, a figure below the Board's guideline of 50%
 
 
 [38]
 This is apparently part of the court's rationale. See at ---. --- of --- U.S.App.D.C., at 774 of 566 F.2d
 
 
 [39]
 Some "goals" discussed might relate directly to increasing routine operations by United States-flag ships, but these were of minor, if any, importance. House Hearings, supra note 6, at 694 (Representative Welch) ("if you eliminate national defense from this bill, you might as well throw it out the window, because Congress would not be concerned about it at all"). They were more in the nature of beneficial impacts of the statute and not the purposes for which it was enacted. Compare S.Rep. No. 1080, 91st Cong., 2d Sess. 9-11, (1970) U.S.Code Cong. & Ad.News 4188, 4190 (purposes of 1936 Act are still relevant to 1970 amendments: "(t)o permit our security and economy to become totally dependent upon foreign vessels, operated by foreign crews, subject to the wishes of foreign governments(,) would be to run an unacceptable risk") with id. at 21-22, (1970) U.S.Code Cong. & Ad.News at 4195-4196 (1970 amendments would beneficially affect unemployment, freight rates, and the balance of payments deficit). None of these benefits, moreover, was discussed by the Board, and none of them appears on its face to be relevant to the determination of adequacy in this case. For instance, the desire to provide service where there is not already adequate service by anyone else, H.R.Rep. No. 1277, supra note 6, at 9, certainly does not apply to Trade Route 29
 Only two ancillary benefits were of much importance. Many Representatives and Senators mentioned the beneficent effects on the depression-era unemployment picture of increasing the demand for shipbuilders and seamen. See H.R.Rep. No. 1277, supra note 6, at 11; S.Rep. No. 713, supra note 23, at 7. Although unemployment is once again high, the legislative history as a whole and particularly § 101 of the Act makes clear that increased employment was only a desirable side effect and not a controlling purpose of the legislation. No party to this proceeding argues that the Act should be viewed as a public works project.
 Some Congressmen apparently felt that having a large United States merchant marine would somehow lower transportation rates and thus increase our sales abroad. E. g., House Hearings, supra note 6, at 1237 (radio address of Representative Walsh); id. at 833-834 (testimony of Shipping Division Chief Haag). The fear of exorbitant rates seems to contradict the fear that foreign-flag ships could price below our costs and thus drive United States-flag ships out of the market. Compare H.Doc. No. 118, supra note 23, at 1 (message from President Roosevelt) ("subsidies granted by other nations, shipping combines, and other restrictive or rebating methods may well be used to the detriment of American shippers"). The apprehension was that foreign-flag ships whose own countries' products are in competition with ours might delay shipments and set high rates for our cargo. 80 Cong.Rec. 10575 (1936) (Representative Sirovich); see H.R.Rep. No. 1277, supra note 6, at 8.
 Neither of these concerns seems particularly relevant here because we deal with inbound goods. As long as there is domestic competition for these imports, high rates charged by foreign lines would not seem to hurt participants in our economy. As to outbound goods, our containerized vessel capacity actually at least matches projected cargo for all of Trade Route 29. Board Opinion, J.App. 115. In any event, the effect of subsidies on freight rates may be almost nil owing to the existence of a shipping conference governing rates on the route in question. See Initial Decision, J.App. 22. See generally The Ocean Freight Industry, supra note 9, at 99-100; D. Marx, International Shipping Cartels: A Study of Industry Self-Regulation by Shipping Conferences 264-267 (1953).
 
 
 [40]
 S.Rep. No. 898, supra note 23, at 2; House Hearings, supra note 6, at 63 (Shipping Division Chief Haag)
 
 
 [41]
 See G. Gilmore & C. Black, supra note 23, at 970 n. 65 ("(t)he final goal perhaps ought to be envisioned in terms of result a going-concern merchant marine of the kind required by strategic and other considerations rather than of 'fair competition' " (emphasis in original))
 
 
 [42]
 See House Hearings, supra note 6, at 832-833 (Shipping Division Chief Haag) ("(i)f a national emergency arises, even if it does not take place within 5, 10, or 20 years, and those ships are merely kept in spot condition, it would still be a sound investment for the Nation"); id. at 64-65 (United States would have saved billions of dollars by having an adequate merchant marine available at the outset of World War I rather than having to attempt to construct one after the outbreak of war)
 
 
 [43]
 See note 6 supra and accompanying text
 
 
 [44]
 It is not at all clear from the record that subsidization would remain at the same level in terms of either absolute dollars or effective benefit. The administrative law judge believed that "(n)o greater subsidy payments would be due (the) applicant if the proposals are approved (these may be less without approval) . . . ." Initial Decision, J.App. 4. The Board characterized APL's arguments as "including the point that its application would require no increase in subsidy payments . . . ." Board Opinion, J.App. 126. These conclusions are basically unexplained in the record before us. APL's subsidy application states that the yearly subsidy after approval might be less than without approval due to the decrease in the number of seamen needed for containerships. Record Exhibit 2, at 4. The existing contract does not contain any specific formula other than the general provision that the amount of subsidy will be sufficient to result in parity of costs with foreign vessels. Id. Exhibit 3, at 8-10. See generally C. McDowell & H. Gibbs, Ocean Transportation 268 (1954) ("(b)ecause of the difficulties in determining rates for subsidy payments, most of the postwar contracts have not embodied approved rates")
 The federal appellants reason that because "no increase in the number of vessels was sought, no increase in the amount of (operating differential subsidy) was expected or requested." Brief for Federal Appellants at 13. Yet some components of the subsidy vary with the number of trips, even if the number of vessels subsidized per year remains constant. See, e. g., 46 C.F.R. § 252.32 (1976) (subsidy formula for maintenance and repair).
 In any event, even if APL would not receive more dollars, it cannot be doubted that it would effectively receive an increase in subsidization. If the more efficient configuration of APL's ships allows them to carry the base-demand amount of cargo in less time, the continuation of what seems to be the same subsidy is actually a larger subsidy for that portion of the subsidy allocable to costs that are time-related and not trip-related. For example, the operating subsidy is aimed to a large extent at wage differentials. See note 6 supra. Thus, if an APL ship previously made, for instance, ten trips per year and now can make fifteen, the crew is now only working two-thirds of the year on base-demand cargo, and that would seem to justify only two-thirds of the wage-related subsidy. See, e. g., 46 C.F.R. § 252.31 (1976) (wage-related subsidization based on per diem rate multiplied by number of voyage days). See also House Hearings, supra note 6, at 40-43 (testimony of Solicitor Trimble of Commerce Department) (amount of subsidy for items such as wages and insurance necessarily varies with time needed for voyage). The rest of the subsidy thus should be allocated to increased-demand cargo, and that would give APL something of a competitive advantage over unsubsidized lines with respect to carrying the increased demand. APL implicitly admits this, arguing that if its application is denied it will be forced to "inefficiently lengthen its voyages, operate partially unsubsidized on a marginal profit basis, or reduce its fleet." Board Opinion, J.App. 126 (emphasis supplied).
 
 
 [45]
 Since the advent of the "container revolution," Initial Decision, J.App. 80, many types of cargo are shipped in containers that can more quickly be loaded and unloaded, thus allowing containerships to spend less time in port and more time between ports. See Sea-Land Serv., Inc. v. Connor, supra note 7, 135 U.S.App.D.C. at 308 n. 1, 418 F.2d at 1144 n. 1. Both the administrative law judge and the Board considered containerships to be a separate submarket for purposes of determining adequacy because of the perceived lack of demand substitutability between containerships and breakbulk ships. Initial Decision, J.App. 24; Board Opinion, J.App. 95. This determination has not been challenged
 
 
 [46]
 Cf. American Pres. Lines, Ltd., supra note 16, 4 F.M.B. at 693 (inefficiency caused by "overly refined examination of adequacy and inadequacy of United States-flag services is inconsistent with the purposes and policy of the Act")
 
 
 [47]
 Board Opinion, J.App. 86-87. The Board first interpreted § 605(c) in this manner in 1971. American Pres. Lines, 12 S.R.R. 168 (1971)
 
 
 [48]
 Brief for Appellant APL at 6 n. 4
 
 
 [49]
 I do not, of course, express any opinion as to the correctness of the Board's interpretation of § 605(c) as applicable to this situation. It could be that the Board has good reasons for its conclusion or that in these types of cases the § 605(c) hearing should only concern itself with demand inadequacy and not with inadequacy to meet the statutory purposes. See note 19 supra
 
 
 [50]
 Maj. Op. text accompanying notes 54-55
 
 
 [51]
 Initial Decision, J.App. 9, 68 (unsubsidized service already instituted by APL); Board Opinion, J.App. 87 (same). See also 46 C.F.R. §§ 281.11, 281.13 (1976) (Board may authorize unsubsidized voyages by line receiving subsidy for other services)
 
 
 [52]
 Of course, what little we know on this record indicates that there is an effective increase in subsidization. See note 44 supra. Although it seems shameful to relegate APL to inefficiency, the law is clear that a subsidized line cannot be allowed an undue advantage over a competing unsubsidized line unless necessary to achieve adequacy. And in any case, APL would not be told that it must operate its containerized ships less often than is feasible, but only that it appears that United States-flag vessels can adequately compete without subsidy with foreign-flag vessels for the increased demand and that, if it desires to be one of the lines so competing, it must renegotiate its subsidy contract so that its overall subsidization drops somewhat due to the increased efficiency of the ships serving the base demand. If the returns expected from serving the increased demand exceed the lost portion of its subsidy, APL could be expected to renegotiate. If the returns are not so large, APL probably would choose to sail less often than it would be capable of doing. But in any case, the capability of United States-flag ships to carry United States-bound goods would remain at least as high if APL's request to provide increased service at the same subsidy were not granted. Put another way, APL might choose to make only ten trips per year, but in an emergency its ships could still make fifteen
 The obvious danger is that in a future situation of this kind APL or another line might decide not to adopt a technological change such as containerization at all. This is unlikely both because of the demands of shippers, Board Opinion, J.App. 93, and because the changeover itself received a construction-differential subsidy. See Brief for Appellant APL at 5-6.
 
 
 [53]
 At --- of --- U.S.App.D.C., at 775 of 566 F.2d
 
 
 [54]
 Brief for Appellant APL at 20
 
 
 [55]
 At --- of --- U.S.App.D.C., at 775 of 566 F.2d
 
 
 [56]
 Thus, if the Board believes that denial of subsidization risks inadequate service on this subroute, it could approve APL's request. And since the court apparently misconceives my position, Maj. Op. at note 69, I emphasize that I do not say that 50% Is a conclusive magic number. All I say is that whatever the number, and if a number is used, the Board must compute it in accord with the mandate of the statute. And as I noted earlier, it is the Board, not I, that picked the 50% Figure and utilized it in this case. Perhaps, as note 69 of the court's opinion implies, service on this subroute is inadequate regardless of what is what percentage of what. But that is not what the Board decided, and it is not our office to replace its decisional rationale with our own independent reasoning. See note 19 supra. More importantly, by expanding the Board's formula for adequacy in order to accommodate the court's rationale while ostensibly relying on the Board's reasoning, my colleagues distort the definition of adequacy and seek to justify that approach with the circular assertion that in this case it leads to an appropriate outcome